IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

TAMMY FRYE,

                Plaintiff,

v.                                                                CIVIL  ACTION  NO.  3:10-0107

METROPOLITAN LIFE INSURANCE
COMPANY; TRI-STATE FOOD SYSTEMS,
INC.; DOES 1 THROUGH 10, inclusive,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is the plaintiff's Motion for Summary Judgment [Doc. 41].  Also pending is the

defendant Metropolitan Life Insurance Company's Motion for Summary Judgment [Doc. 35] and

the defendant Tri-State Food Systems, Inc.'s Motion for Summary Judgment. [Doc. 38].  For the

following reasons, the Court **GRANTS** in part and **DENIES** in part the plaintiff's motion, and

**GRANTS** in part and **DENIES** in part the defendants' motions.

**I.**      **Background and Procedural History**

Plaintiff Tammy Frye ("Plaintiff") filed an action under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, against defendants Metropolitan Life

Insurance Company ("MetLife") and Tri-State Food Systems, Inc. ("Tri-State") [collectively, the

"defendants"] on February 1, 2010 stating claims arising out of the defendants' failure to award her

benefits to which she alleges that she is entitled by virtue of being employed at one of Tri-State's

restaurants.  The undisputed material facts are as follows.

Plaintiff began employment with Tri-State on September 13, 2007.  Pl.'s Mem. Supp. Mot. Summ. J. 1, Doc. 42.  She worked as an assistant manager at Tri-State's Kentucky Fried Chicken store in Huntington, West Virginia.  *Id.*  By virtue of her employment, she was eligible to apply for disability benefits under Tri-State's Short-Term Disability ("STD") plan and its Long-Term Disability ("LTD") plan [collectively, the "plans"].  In November of 2007, Plaintiff was injured in a motor vehicle accident.  *Id.* at 2.  She continued to work, however, until around March 18, 2008, when she claims that the effects of the accident rendered her unable to competently perform the duties of her job.[1]  *Id.*

After this, each party's account of the relevant time-line of events is murky and somewhat inconsistent.  Plaintiff seems to have applied for STD benefits around late March of 2008, but her application was not officially transmitted until April 8, 2008 when Tri-State's Human Resources Manager, Arguest Knipp, filled out an application for STD benefits, and submitted it to MetLife, the plan claims administrator.  R. at 228-31.  Shortly after MetLife received the application, it contacted Tri-State to inquire about Plaintiff's on-the-job physical requirements, and began an internal investigation on Plaintiff's claim.  R. at 239-40.  Around April 10, 2008, MetLife contacted Plaintiff's then-treating physician, Dr. Henry C. Goodman, to inquire about her injury.  R. at 241-42.  Dr. Goodman clarified that he was not the doctor who advised Plaintiff to stop working, but at that time he was treating her for myofascial pain syndrome, peripheral neuropathy, greater occipital nerve neuralgia, and lower back pain.  R. at 242.

On the same day MetLife contacted Dr. Goodman, his office mailed MetLife Plaintiff's

---

[1] Plaintiff claims that her doctor had advised her to cease working at that time.

medical records from office visits on March 25, 2008 and April 8, 2008.  R. at 144.  These records referenced the accident.  R. at 144.  On the basis of Dr. Goodman's diagnoses, MetLife approved Plaintiff's initial STD application retroactively from March 25, 2008 until April 12, 2008, the date of Plaintiff's next scheduled visit with Dr. Goodman.  R. at 244-45.  After Plaintiff's April 12, 2008 office visit, Dr. Goodman conveyed to MetLife that Plaintiff was not released to return to work, and did not provide an estimated return date.  R. at 249-50.  MetLife then continued STD benefits for roughly one month to permit continued treatment until her next office visit, which was scheduled for May 12, 2008.  R. at 251-52.

 On May 14, 2008, MetLife again spoke with Dr. Goodman about Plaintiff's May 12, 2008 visit.  R. at 253-54.  He advised MetLife that Plaintiff was still suffering from musculoskelatal headaches and lower pack pain, and would not be able to return to work full time.  R. at 253-54.  A few days later, on May 22, 2008, he completed an Attending Physician Statement ("APS") based on his treatment of Plaintiff.  R. at 72.  In the APS, he opined that Plaintiff could work only four hours a day, walk three hours a day, sit two hours a day, and stand two hours a day.  R. at 72.  Subsequently, MetLife again extended Plaintiff's STD benefits through June 1, 2008.  R. at 253-55.

Plaintiff saw Dr. Goodman again on May 27, 2008.  R. at 258.  He advised MetLife that Plaintiff had obtained trigger point injections and greater occipital nerve blocks at this appointment.  R. at. 258.  Further, Dr. Goodman conveyed to MetLife that a potential return-to-work date had still not been determined.  R. at 258.  Plaintiff again saw Dr. Goodman on June 4, 2008, but MetLife claims that Plaintiff never provided records from this visit.  R. at 27.  The record also shows that, on June 7, 2008, Plaintiff had a CT scan of her head at St. Mary's Medical Center which showed no abnormality of the brain or calvarium, and found no evidence of intracranial hematoma or

hemorrhage. R. at 176.

Throughout April of 2008, Tri-State maintained that it would not accommodate Plaintiff's return to work with any restrictions. R. at 240, 251-52. Despite Tri-State's firm stance, MetLife continued to inquire as to whether it would change its position. Finally, on June 1, 2008, MetLife received a green light from Arguest Knipp. R. at 259. Mr. Knipp advised MetLife that Plaintiff had conveyed to him that she could not return to work as of May 28, 2008. R. at 260. As a result, her employment had been terminated as of May 30, 2008.[2] R. at 260, 270. Strangely, shortly after this call, he stated that Tri-State would now accommodate certain restrictions. R. at 260, 268.

Plaintiff subsequently called MetLife on June 9, 2008 to ask whether her benefits would be extended beyond June 1, 2008. R. at 271. MetLife conveyed to her that STD benefits were no longer payable due to the fact that Tri-State could now accommodate a return to work with restrictions. R. at 271. MetLife thereafter officially notified Plaintiff by letter that her benefits were no longer payable beyond May 30, 2008. R. at 71-72. MetLife then closed Plaintiff's claim on June 11, 2008. R. at 275.

Plaintiff retained counsel, and decided to challenge MetLife's decision. On August 1, 2008, Plaintiff's counsel requested various documents from Tri-State, including a Summary Plan Description ("SPD"), the official plan documents, and other items relevant to Plaintiff's claim. Def.'s Mem. Supp. Mot. Summ. J. 3, No. 39. In response, Tri-State sent copies of the LTD and STD

---

[2] The record demonstrates that Tri-State's position as to Plaintiff's employment status was rather inconsistent. Specifically, Mr. Knipp had on prior occasions told MetLife that Plaintiff had been terminated as of March 20, 2008, not May 30, 2008. *E.g.*, R. at 270-71.

policies, but did not include an SPD.[3] *Id.* Subsequently, on October 9, 2008, Plaintiff's counsel informed MetLife of Plaintiff's desire to appeal the June 9, 2008 decision to terminate her STD benefits, and in the same letter requested the complete contents of the claims file. R. at 197-98. In this letter, Plaintiff's counsel also requested that MetLife open a claim for LTD benefits. R. at 197. By letter dated October 28, 2008, MetLife provided Plaintiff with the claims file, but seemingly did not provide the claim log which was produced in the record for review by this Court. R. at 326-328.

On December 9, 2008, Plaintiff formally appealed MetLife's decision. R. at 58. The appeal letter noted that Plaintiff was no longer seeing Dr. Goodman because of medical insurance coverage issues due to her lack of employment. R. at 58. The letter also advised that Plaintiff had begun seeing Dr. Phillip Fisher, D.O., an orthopedic surgeon who had ordered an MRI to assess Plaintiff's recovery process. R. at 60. Plaintiff also attached a letter from Dr. Larry Baker, which provided as follows:

> This is to inform you that Tammy Frye is a patient in our practice and is being treated for conditions that do not allow her to work in any capacity. Her condition will not allow her to resume work until she can be released by a specialist in neurology . . . .

R. at 66. As MetLife notes, Dr. Baker's letter did not provide a relevant diagnosis or the results of any test he had performed on her.

Roughly one month later, MetLife wrote to Plaintiff's counsel, advising him that because Plaintiff was still waiting for medical records, an extension of time was necessary for purposes of

---

[3] Tri-State also included in its response a summary of benefits for the company's medical plan. Def.'s Mem. Supp. Mot. Summ. J. 3, No. 39. Tri-State alleges that MetLife was identified in the applicable plan documents sent to Plaintiff as the entity responsible for reviewing and paying STD benefits. *Id.* Accordingly, it claims that Plaintiff's counsel decided to focus his attention on pursuing documents in MetLife's possession. *Id.* at 4. In that respect, Tri-State contends that it did not again hear from Plaintiff until February of 2010 when she filed the instant action. *Id.*

rendering a decision on the merits of the appeal.  R. at 25.  MetLife clarified that if additional medical information was not received by January 16, 2009, it would proceed on the appeal with the documentation that was already in the file.  R. at 25.  On January 23, 2009, MetLife decided to go forward with the appeal, but noted that any additional information received from Plaintiff's counsel would be incorporated into the record.  R. at 297-98.

On appeal, MetLife sent Plaintiff's claim file to an independent physician consultant—Dr. Richard Kaplan—for review.  R. at 7.  Shortly thereafter, MetLife received Dr. Kaplan's analysis which determined that there was "no medical information available to support ongoing functional limitations from a physical perspective for the period beyond 05/30/08" and that there were "no clinical findings . . . to support any ongoing diagnosis from a musculoskeletal or physical medicine and rehabilitation perspective."[4]  R. at 41-42.  On February 9, 2008, MetLife sent Plaintiff's counsel a copy of Dr. Kaplan's report, and informed him that duplicate copies were provided to both Dr. Goodman and Dr. Baker, who were free to provide comments.  R. at 22.  While Dr. Baker did not formally respond to the report, Dr. Goodman did respond.  R. at 27.  He disagreed with Dr. Kaplan's conclusions, and reasoned that Plaintiff would have needed roughly twelve months to recover from her injury.  R. at 27.

By letter dated February 18, 2009, Plaintiff was advised that MetLife had upheld its decision on appeal.  R. at 4.  The decision summarized the evidence detailed above, and pertinently provided as follows:

In order to be eligible for continuing disability benefits under this plan adequate medical

---

[4] MetLife claims that Dr. Kaplan attempted to contact Dr. Goodman during his review of the claim file, but was unsuccessful in reaching him.  Def.'s Mem. Supp. Mot. Summ. J. 8, No. 37 (citing R. at 42).

evidence must be provided that Ms. Frye remains unable to perform the duties of her own occupation due to a severity of physical impairments that would preclude occupational functioning. . . . [T]he medical documentation provided for review does not support a severity of impairment that would preclude Ms. Frye from performing her own occupational duties for any employer.  As such, Ms. Frye no longer meets the definition of disability as required by the plan and she is not entitled to any additional benefits under this plan.

R. at 10.  MetLife alleges that the foregoing conclusion was based upon the medical records that had been provided as of the date of the initial decision.  Def.'s Mem. Supp. Mot. Summ. J. 9, No. 37. However, it notes that Plaintiff never provided the results of the MRI her counsel referenced in the December 8, 2008 letter.  *Id.*  Around April 8, 2009, Plaintiff again submitted to MetLife more medical records, including an APS prepared by Dr. Samer Nasher.  R. at 13.  Dr. Nasher conducted an examination on Plaintiff, and concluded that she could sit for four hours, stand for five hours, and walk for eight hours.  R. at 13.  He did not fill out the sections of the APS, however, specifying the dates of treatment, disability, and clinical findings.  R. at 13.  MetLife further points out that Dr. Nasher did not explicitly state that Plaintiff was unable to work.  R. at 13.

Plaintiff filed this action on February 1, 2010.  On August 10, 2010, the parties filed a consent motion request for a settlement conference as well as a request to stay the deadline for cross-motions for summary judgment.  The Court granted the motion, and extended the original deadline to September 14, 2010.  On September 21, 2010, the Court again extended the deadline for the filing of cross-motions to October 12, 2010.  Without formally requesting leave for more time, both Plaintiff and Tri-State filed their cross-motions after the deadline.

## II.    Discussion

Broadly, Plaintiff asserts three claims against all defendants under various ERISA provisions. First, she seeks recovery pursuant to 29 U.S.C. § 1132(a)(1)(B), claiming that she is entitled to STD and LTD benefits despite MetLife's decision to deny her application. Second, she seeks relief under

29 U.S.C. § 1132(c)(1)(B) of ERISA, which authorizes civil penalties where a plan administrator violates certain disclosure requirements.  Finally, she requests attorneys' fees under 29 U.S.C. § 1132(g)(1).  Defendants deny all liability.

### A.    Standard of Review

The parties have filed cross-motions for summary judgment.  To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court generally will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Here, the parties do not dispute the material facts provided in the administrative record. Accordingly, this case may be properly disposed of on summary judgment.

### B.    Claim for Benefits

Plaintiff challenges MetLife's denial of her application for a continuation of STD benefits. In addition, she claims that MetLife never affirmatively made an LTD benefits decision on her application.  As a threshold matter, a plan administrator's benefits decisions are generally reviewed *de novo* unless the plan provides otherwise.  *See Gilbert v. Med. Mut. of Ohio Co.*, 666 F. Supp. 2d 625, 632 (S.D. W. Va. 2009).  In the event that the plan provides for discretionary review, an abuse-of-discretion standard instead applies.  *Id.*  A plan can confer discretion on its administrator "(1) by language which 'expressly creates discretionary authority,' and (2) by terms which 'create discretion

by implication.'" *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 322 (4th Cir. 2008) (citing *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522-23 (4th Cir. 2000)).  Under the abuse-of-discretion standard, a "plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).[5]

Here, it is undisputed that MetLife made a determination denying Plaintiff continuation of STD benefits.  The parties, however, dispute the applicable standard of review this Court should apply to that determination.  First, Plaintiff argues that the Court should apply a *de novo* standard because the there is no language in the STD plan explicitly conferring discretionary authority on MetLife.  MetLife alternatively argues that such authority should be inferred from the following language in the Disability Income Insurance subsection of the plan:

> If You become Disabled while insured, Proof of Disability must be sent to *Us*. . . . If *We* approve Your claim, benefits will begin to accrue. . . . *We* will pay the first Weekly Benefit one week after the date benefits begin to accrue.  *We* will make subsequent payments weekly thereafter so long as You remain disabled. . . . *We* will pay Weekly Benefits to You.  If You Die, *We* will pay the amount of any due and unpaid benefits. . . .

R. at 358 (emphasis added).  The contention is simply that this language clearly implies the breadth of MetLife's discretionary power in making benefits determinations.

In support of this argument, MetLife refers to *Beckner v. Am. Benefit Corp.*, No. 06-0184,

----

[5] Under the abuse-of-discretion standard, "a reviewing court will not disturb a decision if it is 'the result of a deliberate and principled reasoning process and is supported by substantial evidence.'" *Gilbert*, 666 F. Supp. 2d at 633 (quoting *Evans v. Metro. Life Ins. Co.*, 358 F.3d 307, 310-11 (4th Cir. 2004)).  Thus, when reviewing a claim, it is imperative that the court have before it the facts that were known to the administrator—and the facts it relied upon—in making its disability benefit determination.  *See Gilbert*, 666 F. Supp. 2d at 633 (positing that the application of the abuse-of-discretion standard depends in large part on a sound factual foundation).

2006 U.S. Dist. LEXIS 50120 (S.D. W. Va. July 21, 2006), where this Court dealt with a similar issue. In *Beckner*, this Court appeared to express approval with Judge Elizabeth Hallanan's interpretation of discretionary language in an ERISA plan identical to the one the Court faced. *Id.* at *3-4 (citing *Young v. Employer-Teamsters Local Nos. 175-505 Pension Trust Fund*, No. 2:02-0070 (S.D. W. Va. Feb. 27, 2003)). The applicable plan language in *Beckner* provided that "[a]ny payment of benefits under the Plan shall be contingent upon the approval of the Trustees of the application for benefits . . . [filed by] a Participant or a Beneficiary." *Id.* at *3 n. 1. Judge Hallanan concluded in *Young* that the latter language demonstrated the intent of the plan to confer discretion upon the plan administrator. *Young*, No. 02-0070, at *9.

Both the facts and procedural posture in *Beckner* are distinguishable from the circumstances in this case. In *Beckner*, the Court considered only whether additional discovery beyond the applicable administrative record was needed to determine the appropriate deference to be applied to the plan administrator's decision. 2006 U.S. Dist. LEXIS 50120, at *3-4. It explicitly declined, however, to reach the merits of the standard of review issue. *Id.* ("[T]he standard of review issue is not ripe for decision in this case."). Therefore, *Beckner*—and by extension, *Young*—are of little help to the Court's analysis in this case.

Rather, the Court believes that *Woods v. Prudential Insurance Company of America*, 528 F.3d 320 (4th Cir. 2008) is more instructive because it is a more recent pronouncement on the instant issue from our court of appeals. In *Woods*, the court held that plan language simply vesting authority in an administrator to make benefit eligibility determinations is not sufficient in itself to confer discretionary authority. 528 F.3d at 322-23. Both parties in that case agreed that the applicable plan language did not expressly confer discretion on the administrator, but they disagreed

as to whether language defining the mere decision-making function of the administrator was sufficient to confer discretion by implication. *Id.* at 321-23 ("[W]hen [administrator] determines" or "determined by [administrator]"). The court reasoned that if such language was read to confer implicit discretion, an administrator would always possess this general authority because of its responsibility to make eligibility determinations. *Id.* at 324. This application of the *Firestone* rule, that is, would effectively "jettison[] . . . [the] distinction between authority and discretionary authority."[6] *Id.*

Like in *Woods*, the plan language at issue here simply implies that MetLife (1) receives evidence of claims, (2) reviews claims, and (3) either approves or denies those claims. R. at 358. It says nothing of a standard of review to be applied to MetLife's decisions by a reviewing court, nor does it imply that any discretion is to be given to its findings. It merely suggests—perhaps elaborately—that MetLife has the authority to decide claims for STD benefits. This language is insufficient to confer discretionary authority on MetLife by implication, and is clearly insufficient to do as much expressly. The Court thus applies *de novo* review to the relevant benefits determinations.

### 1. STD Benefits

MetLife concluded that the relevant date of disability in this case was March 25, 2008. The STD plan provides for a defined level of income for eligible employees who are unable to perform their duties as a result of a "disability." R. at 350. "Disability" is defined in the following respect:

---

[6] This distinction arises from the rule that Courts are to generally apply trust principles to ERISA determinations. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). A trustee is given the authority to manage a trust, but the authority to manage does not necessarily imply a grant of discretion. *See Woods*, 528 F.3d at 323 (applying the latter reasoning).

> Disabled or Disability means that, due to Sickness or as a direct result of accidental injury: You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and You are unable to earn more than 80% of Your Predisability Earnings at Your Own Occupation for any employer. For purposes of determining whether a Disability is the direct result of an accidental injury, the Disability must have occurred within 90 days of the accidental injury and resulted from such injury independent of other causes.

R. at 350 (emphasis omitted). The maximum potential duration of STD benefits available under the plan is 26 weeks from the date of a disability, R. at 349, and benefits end when an employee is no longer disabled as defined by the plan. R. at 350. MetLife retroactively terminated Plaintiff's STD benefits as of May 30, 2008. In its July 9, 2008 termination letter, MetLife stated as follows:

> Your Health Care provider has indicated that you will be able to return to work and perform the duties of your job on May 30, 2008. Therefore, benefits beyond May 30, 2008 are not payable.

R. at 216 (emphasis omitted).

On *de novo* review, the Court believes that MetLife erred in denying Plaintiff's application for continued STD benefits. There is substantial evidence in the record that supports the conclusion that Plaintiff continued to qualify for STD benefits long after May 30, 2008. This evidence is chronicled below.

Over the several weeks after Plaintiff applied for STD benefits, MetLife corresponded with Tri-State and Plaintiff's medical providers regarding her capacity to return to work.[7] On April 11, 2008, MetLife approved Plaintiff's claim for STD benefits, but noted that it would reevaluate her eligibility after her April 12, 2008 appointment with Dr. Goodman. R. at 244-45. Thereafter,

---

[7] The claim log suggests that on April 10, MetLife obtained a general assessment of Plaintiff's physical job requirements from Tri-State. R. at 239-40. Plaintiff's position required her to (1) walk, stand, sit, bend, twist, crouch, stoop, and kneel frequently, (2) lift, push, pull, and carry up to ten pounds, and (3) reach above her head occasionally. R. at 240.

MetLife extended Plaintiff's STD benefits twice based upon Dr. Goodman's notes and his first APS which suggested that Plaintiff would be prevented from returning to work for a period of time in light of her symptoms.  R. at 251, 255.  After Plaintiff's follow-up visit to Dr. Goodman's office on May 27, 2008, Dr. Goodman advised MetLife that Plaintiff had obtained trigger point injections and greater occipital nerve blocks.  R. at 258.

The initial correspondence between MetLife, Plaintiff, and Plaintiff's medical providers establishes that Plaintiff had qualified for STD benefits before May 30, 2008.  Yet as Plaintiff points out, MetLife has not provided any evidence that there was a difference in her health after that date.  She was still restricted in the amount of work should could perform, and Tri-State repeatedly stated that it would not accommodate a return to work with restrictions.  *E.g.*, R. at 240-41.  The Court agrees with Plaintiff that she was "unable to earn more than 80% of [her] Predisability earnings" as defined in the STD plan.  R. at 350.  The Court finds unpersuasive MetLife's argument that the record lacked any medical evidence that she had restrictions and limitations that rendered her unable to return to work.  The May 29, 2008 entry from MetLife's own claim log suggests that a call with Dr. Goodman revealed that a return-to-work date had not yet been determined because of her condition.[8]  R. at 258.

Nor does the Court's conclusion change when considering the evidence presented on appeal.  In that respect, MetLife's February 18, 2009 denial letter pertinently stated:

In summary, the medical documentation provided for review does not support a severity of

---

[8] As noted, Tri-State admittedly stated that it would accommodate a return to work with restrictions on June 2, 2008, a few days after it had terminated Plaintiff's employment.  R. at 259-60.  However, the Court finds it suspect that Tri-State would have suddenly changed its stance on this issue in light of the fact that there was no interim material evidence suggesting that Plaintiff was suddenly healthy enough to return to work.

impairment that would preclude Ms. Frye from performing her own occupational duties for any employer. As such, Ms. Frye no longer meets the definition of disability as required by the plan and she is not entitled to any additional benefits under this plan.

R. at 10. The medical documentation MetLife considered purportedly included Plaintiff's own self-reporting of her symptoms; a letter from Dr. Baker stating that she was unable to return to work in any capacity until release by a neurologist; Dr. Goodman's reports; the results of various other medical examinations; and, primarily, an independent evaluation from Dr. Richard Kaplan, a physician consultant retained by MetLife to examine Plaintiff's medical records and other documents in the claims file. R. at 5-10.

After reviewing the records, Dr. Kaplan submitted a fill-in-the-blank question form to MetLife, and determined that there was "no medical information available to support ongoing functional limitations from a physical perspective for the period beyond 05/30/08" and that there were "no clinical findings . . . to support any ongoing diagnosis from a musculoskelatal or physical medicine and rehabilitation perspective" during the same period. R. at 41-43. He also concluded that the evidence did not show that Plaintiff suffered from a neurological condition. R. at 9. Rather, he opined that the evidence supported nothing more than a soft tissue injury which should have taken roughly twelve weeks to heal. R. at 10.

The Court does not find Dr. Kaplan's report persuasive. Dr. Kaplan simply concurred with the arbitrary May 30, 2008 cut-off date without actually examining Plaintiff. Dr. Goodman, however, was Plaintiff's treating neurologist until she was no longer able to maintain her medical insurance. In Dr. Goodman's reply to the report, he agreed generally with Dr. Kaplan's conclusion that soft tissue injuries need twelve weeks to heal, but stated that Plaintiff appeared to have ongoing and severe symptoms that would necessitate a full recovery time of a year. R. at 10.

-14-

The Court further does not find dispositive Dr. Kaplan's conclusion that there were no clinical findings supporting a neurological impairment that related to Plaintiff's self-reported degree of symptoms. While the record demonstrates that Plaintiff did exhibit neurological symptoms, she need not have suffered a neurological impairment to be disabled within the meaning of the STD plan. A severe soft tissue is itself sufficient if it meets the definition of "disability." Whatever the ultimate combination of problems that plagued Plaintiff, those problems counseled Dr. Goodman to a conclusion that her case was severe enough to warrant a recovery time of more than a year. MetLife continuously relied upon, and credited, Dr. Goodman's analysis in initially extending Plaintiff's STD benefits. The Court simply does not find credible its refusal to now do so.

MetLife had on review other evidence supporting a finding of continued disability, including the following: the results of a March 28, 2008 MRI which demonstrated some degenerative change in Plaintiff's spine, R. at 8; the results of an April 8, 2008 MRI of the lumbar spine which revealed degenerative disc disease, R. at 8; and the results of electrodiagnostic studies which showed a peroneal neuropathy from leg crossing and a peripheral neuropathy, R. at 8. The foregoing evidence is further magnified in light of Dr. Samer Nasher's Attending Physician Supplementary Statement which suggested that Plaintiff was still under applicable work restrictions as of March 30, 2009, and still obtaining extensive medical treatment for her condition. R. at 13-15. In the supplement to his report, Dr. Nasher opines that Plaintiff still suffered from posttraumatic low back pain, continual migraine headaches, cervical muscle spasms and bilateral occipital cephalalgia, memory problems, insomnia, and facet joint disease. R. at 14.

MetLife rationalizes its decision by noting that it was not obligated to award benefits to Plaintiff because she was not receiving treatment and not providing documentation regarding her

continued disability. R. at 358 (STD policy; noting that MetLife may request periodic proof that a claimant is disabled after initially approving a benefit award). However, as Plaintiff demonstrates, she continued to follow the instructions of her doctors, and correspond with MetLife at the appropriate times, providing it with the relevant medical documentation it needed for her appeal. R. at 281, 291-92. The record clearly indicates that Plaintiff retained more than one physician during the pendency of her claim review process with MetLife. *See, e.g.*, R. at 6 (noting that Plaintiff advised MetLife that she had been seeing, among others, a family physician, a chiropractor, and a neurologist); R. at 16 (Dr. Nasher's progress notes as of December 15, 2008). The STD plan does not require more than this.

Accordingly, on *de novo* review, the Court **GRANTS** Plaintiff's Motion for Summary Judgment as to STD benefits, and **DENIES** MetLife's Motion for Summary Judgment as to the same issue. MetLife abused its discretion in principally relying on the opinion of Dr. Kaplan, notwithstanding the substantial evidence that Plaintiff had a disability that would forbid her from returning to work for a longer period of time than it had initially determined.

The Court need not remand where the evidence displays that the administrator clearly abused its discretion. *See Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993). While the evidence suggests that Plaintiff was eligible for STD benefits for a period of time after May 30, 2008, the correct amount of benefits to which Plaintiff is entitled, and the appropriate cut-off date for such an award, must still be determined. Because the relevant date of disability in this case was March 25, 2008, STD benefits could have only been extended through September 22, 2008 in light of the time constraints in the STD plan. R. at 349.

After reviewing the entire record, the Court believes that MetLife should have awarded

-16-

Plaintiff STD benefits retroactively through September 22, 2008.  Plaintiff's symptoms appear to have resulted primarily from her automobile accident, and the evidence submitted on review supports her claim that she was disabled within the meaning of the STD plan for the relevant time period.  Further, the Court simply does not find persuasive Tri-State's sudden change of heart in agreeing to accommodate a return to work with restrictions as of the original cut-off date.  It terminated Plaintiff's employment on May 30, 2008, and was thus free to make such a conclusion in order to support a general denial of benefits by MetLife.  Accordingly, the Court **ORDERS** MetLife to pay Plaintiff STD benefits up to the applicable expiration date in accordance with the plan.

Finally, the district court has the discretion to both mandate an award of pre-judgment interest, and to set the rate of that interest award.  *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030-31 (4th Cir. 1993).  Moreover, "pre-judgment interest on a participant's claim must . . . accrue upon the denial of benefits."  *Gower v. AIG Claim Servs., Inc.*, 06-154, 2007 U.S. Dist. LEXIS 59136, at *13-14 (N.D. W. Va. Aug. 10, 2007).  In accordance with the practice of other courts in this circuit, the Court awards pre-judgment interest at the rate of 7.00% per annum—the applicable rate under W. Va. Code § 56-6-31.  *See Gower*, 2007 U.S. Dist. LEXIS 59136, at *14.  Because Plaintiff's claim for STD benefits was denied by appellate review on February 18, 2009, the Court **ORDERS** that pre-judgment interest accrue from that date.

### 2.    LTD Benefits

In addition to STD benefits, Plaintiff seeks roughly $40,000 in LTD benefits.  MetLife argues that the LTD claim is premature because Plaintiff failed to exhaust her administrative remedies under the plan.  ERISA does not explicitly contain an exhaustion requirement, but benefit

plan participants generally must exhaust plan administrative procedures before gaining access to the

courts.  *See Gayle v. United Parcel Serv., Inc.,* 401 F.3d 222, 226 (4th Cir. 2005).  "This exhaustion

requirement rests upon the Act's text and structure as well as the strong federal interest encouraging

private resolution of ERISA disputes."  *Makar v. Health Care Corp.*, 872 F.2d 80, 82 (4th Cir.

1989).

      The applicable LTD plan provision sets forth the following procedures for filing an LTD

claim:

> [Employees must o]btain a claim form from the Employer and fill it out carefully. Return the
> completed claim form with the required Proof to the Employer.  The Employer will certify
> Your insurance under the Group Policy and send the certified claim form and Proof to
> [MetLife].

R. at 417.  Employees may also obtain a claim form directly from MetLife. R. at 417.  MetLife

argues that Plaintiff never pursued the filing of an LTD claim form, and that it never adjudicated a

claim with respect to Plaintiff's entitlement to LTD benefits.  In addition, MetLife argues that

Plaintiff's October 9, 2008 letter requesting that MetLife "open a claim for long term disability

benefits" was simply insufficient to initiate a claim under the LTD plan. R. at 62.  Plaintiff concedes

that her October 9, 2008 claim initiation letter did not strictly comply with the claim procedure

outlined in the LTD policy.

      At the threshold, it appears that MetLife is correct.  Plaintiff never filed a formal LTD claim.

Thus, absent a legally sufficient excuse, Plaintiff has failed to exhaust administrative remedies under

the LTD plan.  Plaintiff makes two arguments, however, that serve to excuse her failure to formally

initiate an LTD claim.  First, she contends that her failure to file a claim form should be excused

because of MetLife's own failure to follow its internal plan procedures.  Second, she argues that the

defendants failed to provide her with applicable plan documents in a timely fashion, making

-18-

compliance impossible and futile in this case.

### a.     Procedural Problems

Plaintiff argues that her right to file suit has accrued in this case because both defendants failed to follow reasonable claims procedures.[9]   Generally, employers are "obligat[ed] to establish and maintain reasonable claims procedures."  29 C.F.R. § 2560.503-1(b).  Pertinently for this case, plan claims procedures are reasonable if "[a] description of all claims procedures . . . and the applicable time frames is included as part of a summary plan description meeting the requirements of 29 C.F.R. § 2520.102-3."  29 C.F.R. § 2560.503-1(b)(2).

Plaintiff contends that she could not have filed an LTD claim at the time she initiated her STD claim because she was not provided with plan documents that detailed the relevant procedures for filing LTD claims.  The applicable LTD policy states that a claimant must provide proof of disability no later than 90 days after the date of the loss—in this case, March 25, 2008.  However, MetLife and Tri-State failed to provide Plaintiff with the relevant plan documentation detailing the

---

[9] Plaintiff seems to make an ancillary argument that an LTD claim was filed by implication, and that MetLife never issued a decision on it.  In support of this contention, she points to MetLife's internal notes on the claim log in response to her counsel's inquiry about filing an LTD claim.  She argues that these discussions imply that a claim was filed, and that a decision was never issued on it, effectively amounting to a "deemed denial" under ERISA. ERISA does provide mechanisms that serve to prevent claimants from suffering prejudice where plan administrators fail to act on a benefits application.  *Patrick v. Calgon Carbon Corp.*, No.10-1108, 2010 U.S. Dist. LEXIS 118684, at *13-14 (S.D. W. Va. Nov. 8, 2010) ("[W]here ERISA claim . . . procedures are not [established or] followed by a plan administrator, a claimant is 'deemed to have exhausted the administrative remedies available under the plan . . . [and is] entitled to pursue any available remedies . . .' including judicial review." (citing 29 C.F.R. § 2560.503-1(l)).  However, MetLife's internal discussions on a potential LTD claim do not excuse Plaintiff's failure to follow claim procedures under the LTD plan.  Nor should they necessarily be interpreted as the initiation of official review procedures for an LTD claim under the plan.  *See Vaughan v. Celanese Ams. Corp.*, 339 Fed. Appx. 320, 323 (4th Cir. 2009) (noting that a plan fiduciary need not initiate or follow formal claim review procedures every time internal discussions may affect a potential claim).

procedures for filing an LTD claim until August 12, 2008 when she was given a physical copy of the LTD policy. In addition, the defendants never provided Plaintiff with an SPD. The Court finds that the defendants do not offer a compelling excuse for their failure to timely provide these documents to Plaintiff.

Some courts have found that the exhaustion requirement is not excused in the face of an administrator's failure to provide an SPD or other plan documents where a claimant otherwise has notice of applicable grievance procedures. *See Glaus v. Kaiser Found. Health Plan*, No. C-09-2232, 2009 U.S. Dist. LEXIS 81089, at *10-12 (N.D. Cal. Sept. 8, 2009) (refusing to excuse claimant from exhausting plan remedies even though she was never provided with an SPD). Courts in this circuit have determined that an administrator's failure to comply with certain ERISA procedural requirements in 29 C.F.R. § 2560.503-1 requires a remand for a full and fair review. *Berry v. Ciba-Geigy* Corp., 761 F.2d 1003, 1007 n.4 (4th Cir. 1985) (suggesting that the district court should remand for full and fair review where a plan administrator fails to comply with the applicable ERISA procedural guidelines in 29 C.F.R. § 2560.503-1); *see also Hall v. CNA Ins. Cos.*, 02-0264, 2007 U.S. Dist. LEXIS 21507, at *17-19 (S.D. W. Va. March 26, 2007) (remanding a case for further review where a plan administrator failed to notify the claimant of the applicable plan review procedures). The Court believes that Plaintiff could not have reasonably complied with the 90-day deadline to provide proof of disability to MetLife because she did not receive the LTD policy until August 12, 2008.

MetLife argues that the LTD plan document clearly states that failure to provide notice and proof of a disability will not cause the claim to be denied if such notice or proof is provided "as soon as reasonably possible." R. at 417. While this may be true, the Court does not wish to simply leave

the decision on whether to open a claim for LTD benefits up to MetLife when the delay in the disclosure of the plan documents was partially its fault. The Court therefore finds that Tri-State and MetLife failed to substantially comply with governing ERISA procedural requirements in that they did not give Plaintiff the applicable plan documents until more than 90 days after her loss, in contravention of their duty to disclose these documents to plan participants. In addition, the Court finds that the defendants failed to provide Plaintiff with an SPD setting forth the method for filing an LTD claim as required by ERISA. *See* 29 C.F.R. § 2560.503-1(b)(2).

The Court accordingly **GRANTS** MetLife's Motion for Summary Judgment to the extent that it seeks dismissal pending exhaustion of administrative remedies, but **DENIES** it **WITHOUT PREJUDICE** otherwise. Moreover, the Court **DENIES WITHOUT PREJUDICE** Plaintiff's Motion for Summary Judgment, and **ORDERS** that this case be remanded to afford Plaintiff a chance to initiate an LTD claim, and to permit a fair conclusion to the administrative process.

### b.    Impossibility and Futility

As discussed, the policy provides that proof of disability must be given to the employer no later than 90 days after the date of the loss. Plaintiff argues that because she was never given any information regarding claims procedures until August 12, 2008, her compliance with the plan's dictates was simply impossible, or futile, in this case. Further, she implies that MetLife would likely have denied her claim on the merits because of its treatment of her STD claim.

The exhaustion requirement is waived where a claimant makes a "clear and positive" showing that any attempt to pursue the administrative remedy in question would have been futile. *Makar*, 872 F.2d at 83; *Bonham v. Jefferson Pilot Fin. Ins. Co.*, No. 3:08-515, 2010 U.S. Dist. LEXIS 39425, at *7-8 (W.D.N.C. March 31, 2010). However, the futility exception "has been

applied only when resort to administrative remedies is 'clearly useless.'" *Kern v. Verizon Communs., Inc.*, 381 F. Supp. 2d 532, 537 (N.D. W. Va. 2007) (quoting *Comm. Workers of Am. v. AT&T*, 40 F.3d 426, 433 (D.C. Cir. 1994)).

In this case, Plaintiff has not shown that MetLife would necessarily deny her LTD claim on a remand. The Court has already determined that the defendants failed to comply with ERISA procedural requirements in that they failed to provide Plaintiff with the appropriate plan documents instructing her that she had to file a claim and proof of disability within 90 days after her official loss date of March 25, 2008. However, the chance of MetLife denying Plaintiff the opportunity to submit an LTD claim pursuant to the plan's procedural provisions does not necessarily imply that MetLife would fail to render a fair decision on the merits of a properly filed claim. Plaintiff has extensive medical documentation and evidence—obtained both before and after MetLife rendered a final decision on her STD application—that would support a claim for LTD benefits. Accordingly, Plaintiff has not made a "clear and positive" showing that resort to the administrative process would be futile in this case.

### C.    Civil Penalties

Plaintiff seeks civil penalties against both MetLife and Tri-State for both of the defendants' failure to provide her with certain information relevant to her benefits application, including an SPD and other evidence she could have used to perfect her claim. Her allegations as to each defendant are addressed in turn.

### 1.    MetLife

Plaintiff first contends that she is entitled to an award of civil penalties against MetLife pursuant to 29 U.S.C. § 1132(c)(1)(B) because of various procedural irregularities that occurred

during the processing of her benefits claim. Specifically, she argues that MetLife both failed to provide her with a copy of the claim log, and neglected to timely identify medical and vocational experts it planned to use in adjudicating her claim, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iii). That regulation provides that a claim procedure will not be deemed to afford a reasonable opportunity for full and fair review unless it provides a claimant with reasonable access to, and copies of, all documents relevant to the claimant's benefits application. 29 C.F.R. § 2560.503-1(h)(2)(iii). Further, in denying benefits, she claims that MetLife administered her claim in a way that inhibited efficient processing, and did not provide her with the specific reason for its adverse determination. MetLife responds to these allegations by arguing that Plaintiff is simply not entitled to civil penalties against it under 29 U.S.C. § 1132 because it is not a "plan administrator" or "plan sponsor" within the meaning of that section.

A claimant may bring an action for civil penalties under 29 U.S.C. § 1132(c)(1) against a plan administrator. *See Brooks v. Metrica, Inc.*, 1 F. Supp. 2d 559, 565 (E.D. Va. 1998) (suggesting that civil penalties are available against plan administrators who refuse to comply with a request for information). Under ERISA, a plan "administrator" means the person or entity specifically designated by the terms of the instrument under which the plan is operated, or if there is no such designation, the plan sponsor. 29 U.S.C. § 1002(16)(A)(i)-(ii). "Plan sponsor" means:

> (i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan.

*Id.* § 1002(16)(B). Both MetLife and Tri-State have filed a joint affidavit stipulating that Tri-State is the plan administrator.

-23-

The Court finds that MetLife is not a plan administrator within the meaning of ERISA, and therefore cannot be the subject of an action for civil penalties.  Plaintiff cites authority supporting the proposition that an entity involved in mere claims administration may be treated as a plan administrator under § 1132(c)(1) where it is shown to actually control the administration of the plan.  *See Law v. Ernst & Young*, 956 F.2d 364, 372 (1st Cir. 1992) (holding as much, and discussing various district court cases supporting its reasoning).  From this Court's review, it does not appear as if our court of appeals has specifically addressed the issue of whether an entity like MetLife involved in claims administration may nonetheless be considered a "plan administrator" notwithstanding the fact that it does not fit the definition in 29 U.S.C. § 1002(16)(A)(i)-(iii).[10]

In this case, MetLife is the insurer responsible for administering claims for Tri-State.  However, the Court does not believe that this function somehow transforms it into the plan administrator for purposes of assessing civil penalties.  *See Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 743-44 (8th Cir. 2002) (upholding district court entry of summary judgment on claims for civil penalties against a claims administrator because "control over claims under [a] policy . . . did not transform it into the Plan Administrator").

Moreover, even if this Court were to adopt Plaintiff's approach, she has still not explained or shown how MetLife has somehow controlled administration of the plan in this case.  *Law*, 956

---

[10] Plaintiff claims that because the initial STD policy produced by Tri-State included two separate cover sheets naming two separate employers, it is not clear whether the plans at issue were single or multiemployer plans, or if the plans had separate entities as sponsors.  For that reason, Plaintiff contends that she remains oblivious to this day as to whom the plan administrator is.  However, regardless of whether the plan is a single or multiemployer plan, the civil penalty analysis under 29 U.S.C. § 1132(c)(1) still necessitates an inquiry as to whether MetLife can be considered a "plan administrator" in the first instance.  Plaintiff's confusion as to the true identity of the plan administrator has little to do with MetLife's liability.

F.2d at 372 (noting that, in order to impose civil penalties in this regard, it must be shown that the entity or person in question controlled the administration of the plan).   Accordingly, MetLife's Motion for Summary Judgment is **GRANTED** insofar as it seeks dismissal of Plaintiff's claim for civil penalties.   Plaintiff's Motion for Summary Judgment as to civil penalties against MetLife is **DENIED**.  Those claims should be directed toward Tri-State, the plan administrator.

### 2.   Tri-State

Plaintiff argues that she is entitled to $85,470 in civil penalties against Tri-State because of Tri-State's failure to comply with her August 1, 2008 request for an SPD.  Plaintiff attaches a return receipt showing that the request was received by Tri-State on August 4, 2008.  Pl.'s Mot. Summ. J., No. 41 (Exhibit H).

An SPD is a summary of a participant's benefits written in a manner calculated to be understood by the average plan participant.  29 C.F.R. § 2520.102-2(a).  A plan administrator must generally furnish an SPD to an employee within ninety days after the employee becomes a plan participant.  *See* 29 C.F.R. § 2520.104b-2(a)(1).  The Court may impose civil penalties upon an administrator who fails to comply with a written request to furnish plan documents, including an SPD.  29 C.F.R. § 1132(c)(1)(B).  Because the plan administrator is required to produce any documents within 30 days after receipt of a proper request, the date of noncompliance in this case would be September 4, 2008.

Tri-State does not contest the latter summary of the law and facts in this case.  Rather, it argues that Plaintiff's claim for an award of civil penalties is barred by the applicable statute of

limitations.[11]  ERISA does not include a statute of limitations for civil penalty claims under  29 U.S.C. § 1132(c)(1).  However, courts generally apply the limitations period for an analogous state cause of action.  *See, e.g., Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 337 (4th Cir. 2009) (noting that "courts must 'borrow the state law limitations period applicable to claims most closely corresponding to the federal cause of action.'" (citing *White v. Sun Life Assurance Co. of Can.*, 488 F.3d 240, 245 (4th Cir. 2007) (citation omitted))); *Underwood v. Fluor Daniel Corp.*, No. 95-3036, 1997 U.S. App. LEXIS 1410, at *15-16 (4th Cir. Jan. 28, 1997) (discussing whether to apply a South Carolina rule requiring parties to commence an action for statutory penalties within a year).

The purpose of 29 U.S.C. § 1132(c)(1) is penal in nature.  *See Underwood*, 1997 U.S. App. LEXIS 1410, at *15.  As a result, in determining an applicable limitations period under § 1132(c)(1), many courts have applied analogous state limitations periods for statutory penalty claims.  *See, e.g.*, *Hakim v. Accenture United States Pension Plan*, 656 F. Supp. 2d 801, 822 (N.D. Ill. 2009) (applying Illinois's two-year limitations period for statutory penalty actions to the plaintiff's civil penalty claims under § 1132(c)(1)); *Gregorovich v. E. I. DuPont De Nemours*, 602 F. Supp. 2d 511, 517 (D. Del. 2009) (applying Delaware's one-year limitations period for civil forfeiture to a § 1132(c)(1) civil penalty claim).  The Fourth Circuit suggests that this approach is correct.  *See Pressley*, 553 F.3d at 339 (applying a South Carolina statutory penalty limitation period to a § 1132(c)(1) claim).

---

[11] Tri-State also argues in the alternative that a statutory penalty under 29 U.S.C. § 1132(c)(1) is not warranted under the circumstances in this case because Plaintiff suffered no prejudice in Tri-State's failure to provide the SPD.  The Court does not address this argument, but notes that it is not necessary that a party requesting documents demonstrate prejudice as a prerequisite to the imposition of penalties under 29 U.S.C. § 1132(c)(1).  *Chafin v. NiSource, Inc.*, 703 F. Supp. 2d 579, 595 (S.D. W. Va. 2010) (citing *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir. 1996)).

Tri-State argues that the Court should apply a one-year limitations period in accordance with the reasoning of the court in *Harvey v. Mingo Logan Coal Co.*, 274 F. Supp. 2d 791 (S.D. W. Va. 2003). That case, however, is not exactly on point. In *Harvey*, the court found a one-year limitations period for unfair insurance-related practices under the West Virginia Unfair Trade Practices Act analogous to a plaintiff's claim which alleged that his employer had failed to comply with COBRA notification requirements for the continuation of plan benefits. 274 F. Supp. 2d at 795. The remedies available to a plan participant in the face of a failure of an employer to comply with notification duties under COBRA, 29 U.S.C. §§ 1166(a)(4)(A) and 1166(a)(3), are not entirely analogous to those available if a plan administrator fails to provide requested information in violation of 29 U.S.C. § 1132(c)(1) of ERISA.

In this case, the parties have not pointed to a specific West Virginia statute of limitations for civil penalty or forfeiture claims.[12] Nonetheless, a state's "catchall" statute of limitations may be applied to 29 U.S.C. § 1132(c)(1) actions where there is otherwise no analogous statutory limitations period. *See Phillips v. Wythe County Cmty. Hosp.*, No. 7:08-10016, 2008 U.S. Dist. LEXIS 102969, at *9-11 (W.D. Va. Dec. 22, 2008) (applying Virginia's general two-year catchall statute of limitations to a § 1132(c)(1) action). The Fourth Circuit seems to have also expressed approval with this approach. *Id.* at *10-11 (citing *Harvey v. Mingo Logan Coal Co.*, 104 F. App'x 838, 840 n. 4 (4th Cir. 2004)). W. Va. Code § 55-2-12(c) provides a one-year general catchall limitations period

---

[12] In her response to Tri-State's Motion for Summary Judgment, Plaintiff suggests that the applicable statute of limitations may derive from Kentucky state law because of a written reference in the general application for group insurance noting that the group benefits policy should be governed by the law of Kentucky. However, Plaintiff has provided no legal support for this suggestion. As Tri-State points out, this action was filed in West Virginia and Plaintiff is a West Virginia resident who worked at one of Tri-State's West Virginia restaurants. The action, in essence, seems to be focused on West Virginia.

for accrued actions.  Accordingly, the Court applies § 55-2-12(c)'s one-year limitations period to the instant claim under 29 U.S.C. § 1132(c)(1).

Now that the applicable statute of limitations is determined, the Court must next decide when the applicable cause of action accrued.  Generally, while state law provides the relevant statute of limitations period for claims under ERISA, federal law determines when the relief accrues.  *See Phillips v. Wythe Cnty. Cmty. Hosp.*, 2008 U.S. Dist. LEXIS 102969, at *14-15 (applying the federal discovery rule to a claim for statutory penalties).  The federal discovery rule provides that the statute of limitations should not begin to run until a plaintiff discovers, or by the exercise of due diligence should have discovered, the facts forming the basis of her cause of action.  *Id.*

Here, Plaintiff's cause of action for civil penalties under 29 U.S.C. § 1132(c)(1) accrued on September 4, 2008, 30 days after Tri-State received her request for an SPD.  Plaintiff argues that the limitations period should not have begun to run on September 4 because she did not know the true identity of the plan administrator.  Even if the Court assumes that Plaintiff and her counsel did not know the identity of the plan administrator on or after September 4, Plaintiff could have sued *both* MetLife and Tri-State within the limitations period.  Ostensibly, both parties would have then, as they have done now, stipulated to the identity of the plan administrator.  In the event that they would have refused to do as much, Plaintiff could have utilized the extensive tools of federal discovery to find out the administrator's identity for herself.  Instead, Plaintiff waited until February 1, 2010 to file this action.

Accordingly, the Court **GRANTS** Tri-State's Motion for Summary Judgment on the ground that Plaintiff's claim for civil penalties is time-barred, and **DENIES** Plaintiff's Motion for Summary Judgment for the same reason.

### D.    Attorneys' Fees

Finally, Plaintiff requests attorneys' fees both from MetLife and Tri-State.  Under ERISA, the Court, in its discretion, "may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).  In determining whether to award an attorney's fee, the Court should consider (1) the degree of opposing parties' culpability or bad faith; (2) the ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant question regarding ERISA itself; and (5) the relative merits of the parties' positions. *Quesinberry*, 987 F.2d at 1028-29.  No single factor should be decisive in the decision-making process. *Id.* at 1029.

### 1.    MetLife

Plaintiff argues that MetLife displayed bad faith primarily in two different ways. First, she contends that, despite actual knowledge that Tri-State would not accommodate a return to work with restrictions, MetLife's representatives kept calling Mr. Knipp to inquire if Tri-State would change its position in order to avoid continuing STD benefits.  Second, she claims that MetLife failed to provide Plaintiff with the claim log until she brought this action.  MetLife, alternatively, contends that it followed all reasonable procedures in investigating her claim.  Moreover, MetLife claims that, after studying the matter, it could not confirm whether the claim log was ever provided to Plaintiff.  However, it submits that, even if it failed to produce the claim log, its failure was inadvertent.  In that respect, MetLife notes that claims administrators should not be faulted because of a mere oversight. *See Wheeler v. Dynamic Eng'g*, 62 F.3d 634, 641 (4th Cir. 1995) (noting that "mere

-29-

negligence or error does not constitute bad faith").

The Court agrees that MetLife should not necessarily be faulted for continuing to vigorously contact all relevant parties in investigating Plaintiff's claim, absent other evidence of bad intent. However, it troubles the Court that Plaintiff did not receive the claim log until this action was commenced. Mere oversight does not indicate bad faith, but MetLife portrays a company who has detailed and strict internal administrative procedures. This is evident by reviewing the claim log itself. It is undisputed that Plaintiff made specific requests for documents that could have helped her supplement her STD claim and appeal.[13]

Claims procedures are not "deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures . . . [p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). Information is relevant to a claim if it was generated in the course of making the benefit determination, or if it was relied upon during the decision process. *Id.* § 2560.503-1(m)(8).

Here, the claim log was both generated and relied upon by MetLife during the course of its evaluation of Plaintiff's claim for STD benefits. Due to MetLife's failure to disclose the claim log to Plaintiff, the Court finds that it acted in bad faith. It is difficult to believe that its failure was

---

[13] A further review of the record suggests that Plaintiff repeatedly put MetLife on notice of its failure to produce the claim log. R. at 52. For example, by letter dated January 18, 2009, Plaintiff's counsel pointed out that he had discovered that MetLife had been engaged in verbal conversations with individuals in Dr. Goodman's office. R. at 52. As a result, he requested "[a]ny notes of such conversations" because of their likely status as "pertinent documents that [MetLife] relied upon in making [its] decision." R. at 52.

simply inadvertent in light of Plaintiff's repeated requests for all documents relevant to her claim.

Regarding the second factor of the § 1132(g)(1) test, the Court finds that MetLife can absorb an award of attorney's fees. Further, as to factor three, the Court believes that such an award may deter other administrators from failing to disclose material documents relevant to claimants' applications. The fourth factor does not weigh in favor of a grant of attorneys' fees as Plaintiff is not seeking an award for other plan participants. Finally, the merits of the instant substantive claim for benefits favor Plaintiff. As discussed, Plaintiff is entitled to a continuation of STD benefits. And while the Court remands her claim for LTD benefits and declines to award her civil penalties, it does not make a determination on the merits of those claims.

### 2.    Tri-State

Plaintiff also argues that Tri-State's conduct exhibited bad faith in two ways. First, she reasons that Tri-State abruptly changed its stance on agreeing to accommodate a return to work with restrictions for the sole purpose of supporting a denial of benefits after it had terminated her employment and repeatedly declined to permit her to return to work. Furthermore, she argues that Tri-State's failure to provide her with an SPD constitutes bad faith.

As evidence of her first contention, Plaintiff points to Mr. Knipp's statement that "[Tri-State] couldn't keep hanging on with [Plaintiff] and she hadn't been there that long either." R. at 260 (claim log). This statement was made shortly after Tri-State terminated Plaintiff on May 30, 2008. The Court agrees that Tri-State suddenly and inexplicably changed its stance regarding its willingness to accept Plaintiff back to work with restrictions. Taken with Tri-State's inconsistent positions on the date of Plaintiff's termination, the Court believes that Tri-State acted in bad faith in its handling of Plaintiff's benefits claim. It has simply not given an adequate explanation for its

decision to retroactively feign an agreement to accept Plaintiff's return to work with restrictions after it had already terminated her.

Plaintiff additionally argues that Tri-State's failure to provide her with an SPD demonstrates bad faith, and an award of fees is also justified on this basis.  On the other hand, Tri-State reasons that it acted in good faith in attempting to provide all relevant plan documents to Plaintiff.  While it is still not clear from the record whether an SPD actually existed in this case, it is uncontested that one was never provided to Plaintiff.  The Court concludes that this blatant violation of ERISA constitutes bad faith on behalf of Tri-State.

The third factor also weighs in favor of an award.  While Tri-State argues that its efforts to transmit information to Plaintiff were timely and complete, it simply did not attempt to provide an SPD as required by established ERISA law.  The evidence in the record does not suggest unawareness as to this issue as Tri-State implies.  Plaintiff made a specific document request for an SPD, but was not given one.  An award of an attorney's fee would make other companies aware of the significant importance of the SPD in giving claimants a detailed and easy-to-understand explanation of their rights under ERISA plans.

Similar to the analysis with respect to MetLife, the Court believes that the second factor weighs in favor of an award of fees.  Tri-State has itself conceded that it is capable of paying such an award.  Further, the fourth factor does not weigh in favor of a grant of fees because, as discussed, Plaintiff filed this lawsuit for her individual recovery.  Finally, the fifth factor weighs in favor of a grant of fees because Plaintiff has made a successful showing on the merits of her claim for STD benefits.

### 3.      Disposition

For the aforementioned reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment as to attorneys' fees and costs, and **DENIES** the defendants' motions as to same. The Court **ORDERS** that the attorneys' fee award be divided equally between Tri-State and MetLife.

The Court further **ORDERS** Plaintiff to submit a supplemental memorandum setting forth his proposed attorney's fee in this matter by **January 3, 2011**. The supplemental memorandum should contain a detailed account of the time he has spent on this case, as well as an itemized list of litigation-related expenses. The defendants may file a response by **January 10, 2011**. Further briefing on this issue is suspended.

## III.    Conclusion

In accordance with the foregoing opinion, the Court **ORDERS** as follows:

1. That Plaintiff's Motion for Summary Judgment as to her claim for STD benefits be **GRANTED**, and that MetLife's Motion for Summary Judgment as to the same STD benefits be **DENIED**.

2. That MetLife's Motion for Summary Judgment as to Plaintiff's claim for LTD benefits be **GRANTED** insofar as it seeks dismissal pending exhaustion of administrative remedies, but **DENIED WITHOUT PREJUDICE** otherwise, and that Plaintiff's Motion for Summary Judgment as to LTD benefits be **DENIED WITHOUT PREJUDICE**.

3. That Plaintiff's Motion for Summary Judgment as to civil penalties against both MetLife and Tri-State be **DENIED**.

4. That (a) MetLife's Motion for Summary Judgment as to civil penalties be **GRANTED**, and (b) that Tri-State's Motion for Summary Judgment as to civil penalties be **GRANTED**.

5. That Plaintiff's motion for an award of attorneys' fees be **GRANTED** as to MetLife and Tri-State, and that the defendants' motions as to attorneys' fees be **DENIED**.

6. That this matter is **REMANDED** to permit Plaintiff the opportunity to formally file a claim for LTD benefits before MetLife.  This Court **DIRECTS** MetLife to afford Plaintiff a full and fair opportunity to file an LTD claim; to submit all relevant evidence as to such a claim; and to receive any documents, upon request, that are relevant to the decision process.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.


ENTER:        December 20, 2010


ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE